

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00324-CR

_____

VICTOR ALONSO ESPINOZA, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1498968D

_____

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Opinion by Chief Justice Sudderth

## OPINION

## I. Introduction

Appellant Victor Alonso Espinoza had been in a relationship for several years with Kristen[1] when he was accused by her younger sister Amelia of committing various acts of sexual abuse. A jury acquitted Espinoza of continuous sexual abuse of a child but found him guilty as charged on four counts of aggravated sexual assault of a child and two counts of indecency with a child by contact. The jury assessed Espinoza's punishment, and the trial court pronounced judgment, as follows: 10 years' confinement for count 2 (aggravated sexual assault of a child by contacting his penis to Amelia's sexual organ), 10 years' confinement for count 3 (aggravated sexual assault of a child by contacting his penis to Amelia's anus), 5 years' confinement for count 4 (aggravated sexual assault of a child by digital penetration of Amelia's sexual organ), 6 years' confinement for count 5 (aggravated sexual assault of a child by contacting his penis to Amelia's mouth), 2 years' confinement for count 6 (indecency with a child by causing Amelia's hand to contact his genitals), and 2 years' confinement for count 7 (indecency with a child by touching Amelia's breast). *See* Tex. Penal Code Ann. §§ 12.32–.33, 21.11, 22.021.

---

[1]We use pseudonyms to protect the privacy of the complainants, other minors, and their family members. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

In two points, Espinoza appeals these convictions, complaining that the trial court erred by overruling his objection to improper outcry testimony and by overruling his motion for a directed verdict because the State failed to prove his identity.[2]  The State points out that the judgments of four of the counts recite incorrect punishments[3] and asks us to modify them to reflect the correct sentences. We affirm as modified.

## II.  Background

Kristen and Espinoza had been in a relationship for eight years by the time of trial, and he was the father of her two children, Gina and Vince.[4]  They and their children had shared a room in Kristen's parents' house, where Amelia lived.

According to Amelia, she was ten years old the first time Espinoza inappropriately touched her.  Her father had been in the hospital, and her mother, Gina, and Vince had been waiting outside in the truck when her mother asked her to go back into the house and get the phone charger from Kristen's room.  Espinoza

---

[2]A challenge to the denial of a motion for instructed verdict is a challenge to the sufficiency of the evidence.  *Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1051 (2003).

[3]Each of the judgments for these counts states ten years' confinement instead of the actual punishment assessed in open court.

[4]The prosecutor informed the jury during her opening statement that Amelia would tell them about the sexual abuse that she suffered at the hands of Espinoza, who was in a long-term relationship with Amelia's sister Kristen.  Espinoza did not object to his characterization as Kristen's paramour during the prosecutor's opening statement.

was in the room that he shared with Kristen, and when Amelia entered the room, he unzipped his pants, pulled down his boxers, and put her hand on his "thing,"[5] which she said felt hard. Espinoza then started moving Amelia's hand, and at some point, "[h]e put his private part in [her]."[6] She recalled that he told her to be quiet and that incident ended when they heard her mother enter the house.[7] Espinoza zipped up his pants and told her to wash her hands and pull up her pants.

Amelia and other witnesses—the sexual assault nurse examiner and the forensic interviewer—testified about other instances of aggravated sexual assault and indecency between Amelia and Espinoza, but because Espinoza challenges only the sufficiency of the evidence as to identity, we need not go into the details of each offense. *See, e.g., Burks v. State*, PD-0992-15, 2017 WL 3443982, at *1 (Tex. Crim. App. June 28, 2017) (op. on reh'g) (not designated for publication) (observing that the majority of the court of criminal appeals had adopted the view that requiring an intermediate appellate court to resolve aspects of legal sufficiency neither explicitly raised nor even mentioned in the appealing party's brief creates an unworkable burden

---

[5]Amelia defined the male "private part" or "thing" as the part "[i]n the front" of the body used "[t]o pee," i.e., the penis.

[6]Amelia said that Espinoza put his private part "[i]n the front" of her body, "where [she] pee[d] from."

[7]Amelia testified that the front door made a creaking noise; the investigating detective also testified that the family's front door made a loud creaking sound and that it "was just kind of a noisy door."

4

on the lower courts to act as de facto defense counsel for every defendant who raises the issue of legal insufficiency).

Kristen testified during the defense's case and described Amelia as "very manipulative." She testified that Amelia had told her that she knew how to lie and get people to believe her. Kristen claimed that the same day that Amelia told her that Espinoza had touched her, Amelia also told her that it was a lie. On redirect, Kristen said that Amelia had also twice accused Espinoza of having sex with Amelia's mother.

Kristen claimed that Amelia had always been very jealous of Gina, Vince, and Espinoza living in the same house with her and that Amelia wanted Espinoza out of the house. Kristen agreed that after Amelia's allegation came out, she and her children moved out of the house, and she agreed that it upset Amelia "[a] little bit" that the children had moved because she was close to them.

During closing arguments, Espinoza argued to the jury, "So the bottom line is you have got to decide who's telling the truth and who's not. And one of those people that's here being judged, the victim, told you that she lies." He further argued that the evidence fell "woefully short" of meeting the "beyond a reasonable doubt" standard and did not even meet the "clear and convincing" standard. In rebuttal, the prosecutor argued that the evidence was sufficient if the jury believed beyond a reasonable doubt that Amelia was telling the truth and pointed out that the defense had never asked Amelia whether she was lying about what happened with Espinoza.

The jury deliberated for less than two hours before finding Espinoza not guilty as to count 1 and guilty as to the remaining six counts. Neither side presented any evidence on punishment before resting and closing. The jury deliberated for less than an hour before announcing Espinoza's sentences.

## III. Outcry

In his first point, Espinoza argues that the trial court abused its discretion by overruling his objection to forensic interviewer Trista Burden's outcry testimony, complaining that the trial court "apparently did nothing more than compare the level of detail" between Amelia's testimony and Burden's testimony[8] instead of considering that Amelia's outcry to her sister constituted more than a general allusion of sexual abuse. The State responds that Burden was a proper outcry witness because nothing in the record indicates that Amelia told Kristen any of the details of the various acts of sexual abuse inflicted upon her. *See Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (stating that the outcry statute requires "more than a general allusion of sexual abuse"). *But cf. id.* at 94–95 (Clinton, J., dissenting) (arguing that the court reversed the burden of proof because the State, as the outcry statement's proponent, failed to lay the proper predicate for its admission as to the correct "first person").

---

[8]We may not determine a statement's sufficiency for outcry purposes simply by comparing different statements the child gave to different individuals and deciding which person received the most detailed statement about the offense. *Hines v. State*, 551 S.W.3d 771, 781 (Tex. App.—Fort Worth 2017, no pet.).

6

**A. Standard of Review and Applicable Law**

We review a trial court's ruling on an outcry witness designation for an abuse of discretion. *Id.* at 92. A trial court's findings will be upheld when they are supported by the evidence, and the trial court has broad discretion in determining such evidence's admissibility. *Id.* (requiring a clear abuse of discretion to be established by the record before the trial court's outcry witness ruling will be disturbed).

Code of criminal procedure article 38.072, "Hearsay Statement of Certain Abuse Victims," governs the admissibility determination of outcry witness testimony when a sex-related offense is committed against a child younger than 14 years or a disabled person. Tex. Code Crim. Proc. Ann. art. 38.072. This article provides that a statement is not inadmissible during the guilt-innocence phase because of the hearsay rule if, in addition to the State's compliance with the statutory notice requirements, the trial court finds in a hearing outside the jury's presence that:

(1) the statement is reliable based on its time, content, and circumstances;

(2) the complainant testifies or is available to testify at the proceeding; and

(3) the statement:

- describes the alleged offense,

- was made by the complainant against whom the charged offense or other extraneous crime, wrong, or act was allegedly committed, and

- was made to the first person, 18 years of age or older, other than the defendant, to whom the complainant made a statement about the offense or extraneous crime, wrong, or act.

*Id.* art. 38.072, § 2(a)–(b).

At issue here is whether, under article 38.072, Burden was the "first person" to whom Amelia made her outcry. *See id.* art. 38.072, § 2(a)(3). The court of criminal appeals has interpreted the "first person" to mean that "the outcry witness must be the first person, 18 years or older, to whom the child makes a statement that in some *discernible* manner describes the alleged offense." *Garcia*, 792 S.W.2d at 91 (emphasis added); *see West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Because of the way in which the statute is written, an outcry witness is not person-specific, but event-specific.").

The court of criminal appeals has stated that the "discernible manner" must be "more than words which give a general allusion that something in the area of child abuse was going on." *Garcia*, 792 S.W.2d at 91. In *Garcia*, the majority of the court held that the trial court did not abuse its discretion by admitting the hearsay testimony of the State's designated outcry witness instead of considering the seven-year-old complainant's first grade teacher to be the "first person" because the complainant had only told her teacher that something had happened at home and that it had to do with child abuse. *Id.* at 89, 91. The record was void of any specific details as to what the complainant and her teacher talked about and as to any description of the alleged offenses by the complainant to her teacher. *Id.* at 91. The court concluded that the complainant's statements to her teacher constituted nothing more than a general

allusion, while her statements to the State's designated outcry witness contained details of the alleged offenses. *Id.* at 89–90. The court reasoned that the societal interest in curbing child sexual abuse would hardly be served if all that the "first person" had to testify about was a general allegation from the child that something in the area of child sexual abuse was going on at home. *Id.* at 91; *see also Martinez v. State*, 178 S.W.3d 806, 810–11 (Tex. Crim. App. 2005) (explaining that the legislature enacted article 38.072 to admit the testimony of the first adult in whom a child confides regarding abuse because "it is often traumatic for children to testify in a courtroom setting, especially about sexual offenses committed against them").

The dissenting judge in *Garcia* complained that the State had bypassed the procedural protections set out in article 38.072 by misidentifying the child protective specialist as the "first person," which had led Garcia's counsel to object to the testimony of the teacher—the temporal "first person" to whom the child had made an outcry statement. 792 S.W.2d at 94 (Clinton, J., dissenting). Judge Clinton's specific complaint in *Garcia* revolved around the burden placed on the State to designate an outcry witness—specifically, that the statute places the burden on the State as proponent of an outcry witness to establish that the witness designated is the first person to whom the child "described" the offense. *Id.* at 94–95. In his dissenting opinion, Judge Clinton criticized the majority for contorting the burden inherent in the requirement that the State designate and establish the predicate for the outcry witness it planned to offer. *Id.* In his view, this contortion arose when a

9

defendant faced an outcry notice designating someone who potentially was not the first person to whom the child made a statement about the offense. *Id.*

According to Judge Clinton, the majority opinion "seemed to assume" under those circumstances that it became the defendant's burden to establish that this other person was actually the first person to whom an appropriate statement about the offense was made (and even potentially to identify a person to whom a child made a statement before making a statement to the person designated by the State). *Id.* at 95. When the trial court sustained the defendant's objection to the teacher's testimony, there was nothing in the record to contradict the trial court's decision to overrule the hearsay objection to the subsequent testimony of the State's designated "first person." *See id.* at 93, 95 (pointing out that under the facts of the case, the court could "just as easily infer that the child's statements to her teacher *were* more than 'a general allusion'" and that the State was able to bypass "each and every one of Article 38.072's mandated procedures simply by selecting [the child protective specialist] as the 'first person,' and thereby subverted the whole legislative purpose to give the adverse party notice in advance of trial and to ensure the reliability of evidence before its admission to the jury").

While the majority in *Garcia* appears to have abandoned the general rule that the proponent of evidence bears the burden of proving its admissibility, thus reversing the traditional burden of proof in situations like the one before us, *see* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(3); *Garcia*, 792 S.W.2d at 94 (Clinton, J.,

10

dissenting), we cannot ignore or refuse to follow the majority's dictates set out in *Garcia*. *See Sierra v. State*, 157 S.W.3d 52, 60 (Tex. App.—Fort Worth 2004) (stating that "[t]his court is bound by the precedent of the Texas Court of Criminal Appeals and has no authority to disregard or overrule" its precedent), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007). Nor can we consider it dicta when the dissent in *Garcia* specifically addressed this very point to no avail.

## B. The Record

Twelve-year-old Amelia was the first witness to testify. During her testimony, when the prosecutor asked her about when the abuse ended, Amelia replied, "whenever I told my sister." Amelia did not recall the date when asked whether she remembered when she had told Kristen. No one asked Amelia what she had told Kristen. The prosecutor instead asked, "What made you decide to tell your sister?" Amelia responded, "I wanted it to stop."[9] While Amelia testified that the first adult person she had spoken to about the abuse was Kristen, she also testified that she did not tell Kristen everything contained in her testimony, and she did not elaborate on what she had told Kristen. During the defense's case, Kristen testified that Amelia

---

[9]Amelia further testified that she had tried to tell Kristen about the abuse on other, earlier occasions by giving her "signals," whereby she "tried to say it but it wouldn't come out."

11

had told her "that [Espinoza] touched her." The record contains no further details about what Amelia told Kristen.[10]

The trial court held a hearing outside the jury's presence to establish whether Burden was the appropriate outcry witness. Burden, who interviewed Amelia on January 5, 2017, when Amelia was eleven years old, gave specific, detailed statements about Amelia's abuse allegations, including at least one date of occurrence, locations, and sensory and peripheral details such as body positioning, noises, and what happened immediately before and afterwards.[11]

## C. Analysis

Based on the record before us, we conclude that under *Garcia*, the trial court did not abuse its discretion when it allowed Burden to testify as Amelia's outcry witness when neither party developed any testimony about what Amelia told her

---

[10]The investigating police detective testified that Amelia's mother had taken Amelia to Medical Center Arlington for an evaluation "because she was sexually assaulted by her sister's husband," but the record does not reflect who told Amelia's mother about the allegation or any details about the allegation other than Amelia's having told the emergency room staff that it happened "the first week of December and that there was penis penetration." *Cf. Garcia*, 792 S.W.2d at 93 (Clinton, J., dissenting) (noting that the court could infer that the child's statements to her teacher were more than a general allusion when the record reflected that the child spoke to the teacher for 10–15 minutes and related enough about the topic of sexual abuse to motivate the teacher to take the child to the principal, who "felt it necessary to call the Department of Human Services," and DHS "almost immediately sent two specialists to the school to interview the child").

[11]Amelia described to Burden various instances of vaginal and anal penetration, Espinoza's putting his penis in her hand, and Espinoza's putting his hands on her breasts.

sister, leaving the record void as to any specific details of her statement to her sister. *See* 792 S.W.2d at 91–92 (observing that the defense failed to recall an earlier witness or to elicit testimony from the complainant about the specifics of her statement to the earlier witness despite ample opportunity to do so). That is, under *Garcia* and in the absence of any such clarification, we are forced to conclude that the record fails to establish any clear abuse of discretion in the trial court's determination that Burden was the appropriate outcry witness. *See id.* at 92; *Hines*, 551 S.W.3d at 780–81 (holding trial court did not abuse its discretion by overruling objection to forensic interviewer as proper outcry witness when testimony about what complainant told sexual assault nurse examiner prior to forensic interview did not describe the alleged offense in a sufficiently discernible manner to qualify as an article 38.072 outcry); *see also Collins v. State*, No. 02-16-00146-CR, 2017 WL 119486, at *6 (Tex. App.—Fort Worth Jan. 12, 2017, pet. ref'd) (mem. op., not designated for publication) ("[C]ourts have interpreted the statute as providing that the proper outcry witness is generally the first adult to whom the complainant describes 'how, when, and where' the abuse occurred."). We overrule Espinoza's first point.

## IV. Sufficiency

In his second point, Espinoza contends that none of the witnesses identified him at trial as the individual who committed the charged offenses. The State responds that the evidence is sufficient to support the convictions because although none of the State's witnesses specifically identified Espinoza as the perpetrator, the

13

record contains information sufficient for the jury to make a reasonable inference "that the person on whose behalf [Kristen] testified, the person being tried, and the person [Amelia] accused of sexually abusing her were one and the same—[Kristen's] paramour, Victor Espinoza, Appellant."

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

An accused's identity may be proved by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *see Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all

14

reasonable inferences from that evidence."), *cert. denied*, 562 U.S. 850 (2010).[12] And the absence of an in-court identification does not in and of itself render the evidence insufficient on the issue of identity. *Couchman v. State*, 3 S.W.3d 155, 162 (Tex. App.—Fort Worth 1999, pet. ref'd).

Espinoza analogizes the identity question in his case to that of *McCullen v. State*, 372 S.W.2d 693 (Tex. Crim. App. 1963), *Phillips v. State*, 297 S.W.2d 134 (Tex. Crim. App. 1957), and *Hightower v. State*, 389 S.W.2d 674 (Tex. Crim. App. 1965). But these cases are distinguishable because the offending party in each of these cases was unknown to the witnesses.[13]

---

[12]In *Gardner*, the appellant complained the evidence was insufficient to prove that he shot his wife because no witness affirmatively "put him at the scene." 306 S.W.3d at 285. In concluding that the evidence was sufficient to support his capital murder conviction, the court noted that before she died, his wife told the 911 dispatcher that her husband had shot her and what he was driving; the evidence also showed that the appellant had borrowed the vehicle identified by his wife twelve hours before she was shot and returned it the day after she was shot, his credit card was used twice en route to the shooting, and his fingerprints and fibers matching the robe his wife had been wearing when she was shot were found in the vehicle. *Id.* at 285–86. There was also evidence of his consciousness of guilt and the murder weapon. *Id.* at 286.

[13]In *McCullen*, in which the appellant was charged with enticing a minor, neither the complainant nor her mother knew the appellant, and vice versa, and there was no evidence at all to identify the appellant as the party who committed the offense. 372 S.W.2d at 695. The complainant's mother testified that she left her five-year-old daughter playing in the yard while she was away from the house for 15 minutes; when she returned, the complainant told her that a man had asked her into a house and put his penis in her mouth. *Id.* at 693–94. The appellant testified that he did not know the complainant and had been driving his wife back to work during the time that the offense would have occurred. *Id.* at 694. The complainant's mother testified that she did not know the appellant and that the child had pointed out the house to her, but

15

In contrast, here, the record reflected that Amelia knew her assailant—he was her sister's paramour and the father of her niece and nephew and had shared a household with her for several years by the time of the offenses in question—and her sister testified in his defense. *See Perez v. State*, No. 02-10-00493-CR, 2011 WL 2847441, at *4 (Tex. App.—Fort Worth July 14, 2011, pet. ref'd) (mem. op., not designated for publication) (holding that the evidence was sufficient because N.L.'s in-court identification of appellant was unnecessary for his conviction when she testified that she was sexually assaulted by her uncle Antonio Perez, and her family members corroborated that Perez was her uncle). He was identified by name numerous times in the record by witnesses who identified him as the alleged perpetrator. Accordingly, we conclude that the jury had sufficient evidence upon which to determine that

the house was not further identified at trial. *Id.* at 695. Because nowhere in the record did the State ever adduce any testimony any stronger than "this man, his house, he," the court held that there was no evidence to identify the appellant as the party who committed the offense. *Id.*

In *Phillips*, a misdemeanor swindling case in which the court held that the evidence identifying the defendant was insufficient, the complainant had testified that her eyesight was bad and, rather than identifying the defendant as one of the men who came to her house the year before, she said that he "look[ed] like him." 297 S.W.2d at 134–35. And in *Hightower*, an operating-a-vehicle-with-a-suspended-license case, the appellant challenged the record of suspension because it had not been shown to be his record. 389 S.W.2d at 675. The court reversed his conviction after agreeing that no witness had testified that the person on trial was the same person named in the suspension record or otherwise identified him. *Id.* at 675–76 (observing that the person on trial was never identified except as to his driving of the vehicle, his height, his weight, and his hair color).

16

Espinoza was the perpetrator of the offenses being appealed, and we overrule his second point.

## V. Conclusion

Having overruled both of Espinoza's points, we modify the trial court's judgment to reflect Espinoza's sentence of five years' confinement on count 4, six years' confinement on count 5, two years' confinement on count 6, and two years' confinement on count 7, and affirm the trial court's judgment as modified.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Publish

Delivered:  February 21, 2019