

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00192-CR

_____

RONALD STARKEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 4743

Before Kerr and Bassel, JJ.; and Wallach, J.[1]
Memorandum Opinion by Justice Kerr

---

[1]The Honorable Mike Wallach, Judge of the 348th District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

# MEMORANDUM OPINION

A jury found Ronald Starkey guilty of aggravated sexual assault of a child, a first-degree felony, and assessed his punishment at 50 years' imprisonment and a $10,000 fine. Tex. Penal Code Ann. § 22.021(a)(1)(B)(v), (a)(2)(B), (e). After the trial court sentenced Starkey, he appealed, and in his brief, he asserts eight issues that fall into four groups:

- His first four issues attack an allegedly defective indictment and various ramifications that followed as a result;

- His fifth issue attacks Starkey's recorded interviews that the trial court admitted over Starkey's objections;

- His sixth and seventh issues assert that the trial court erroneously admitted outcry-witness testimony; and

- His eighth issue argues cumulative error.

We hold that Starkey has shown error in his sixth and seventh issues but that the errors were harmless, and in his remaining issues, we hold that Starkey has not shown error; thus, we affirm.

## Background

In 2004 when Abby[2] was four years old, she made an outcry to her babysitter in which she identified Starkey, her adoptive father, as the perpetrator. The babysitter then informed Abby's mother (Mother), who discussed the matter with Starkey but

---

[2]We use a fictitious name to refer to the complainant. *See* Tex. R. App. P. 9.8 & cmt., 9.10.

not with Abby. Mother then informed the babysitter that Starkey thought that the babysitter was trying to break up the family, and within about a week after Abby's outcry, Starkey, Mother, Abby, and Abby's younger sister all moved to Oklahoma. Over the next four years, the family moved around 15 times before eventually settling in California in 2009.

Years later, in 2012, Mother and Starkey filed for divorce. But the proceedings dragged on until September 2014, when the trial court finally signed a divorce decree.

Shortly after the divorce, in early 2015 Abby began receiving counseling in San Diego for anxiety, depression, and suicidal ideation. While in counseling, Abby made an outcry to Mother that Mother recognized as the same outcry that the babysitter had related to Mother back in 2004. Mother told Abby's charge nurse, and later both Child Protective Services and the San Diego County Sheriff's Office contacted Mother.

By 2016, an Oklahoma special agent and a Texas investigator had interviewed Starkey in Oklahoma. During those interviews, Starkey acknowledged that something inappropriate occurred with Abby in 2004 in Texas but maintained that it was accidental. Starkey asserted that he was masturbating in the master bathroom when Abby came in unexpectedly, which startled him, and as he turned towards her, he ejaculated over Abby's face and hair. When pressed to answer whether his penis's tip had entered Abby's mouth, Starkey indicated that he did not remember, later conceded that it was possible, then appeared to agree that contact had occurred, and

ultimately did not balk when the investigator twice summarized his statement as including his penis penetrating Abby's mouth.

During trial, the testimony varied greatly regarding Abby's 2004 outcry to her babysitter. The babysitter testified that Abby simply stated that Starkey was touching her in ways that made her feel uncomfortable and denied recalling that Abby had ever said that Starkey had made Abby lick whipped cream off his genitals. In contrast, Mother testified that the babysitter had told her that Abby's outcry described oral sex involving whipped cream. Finally, when Abby herself was asked what she had told the babysitter, she responded, "I told her that he told me that it tastes like whipped cream." Abby did not know whether the babysitter ever told Mother.

At trial, Abby testified that she performed oral sex on Starkey with Starkey's assurances that "the white stuff . . . from his penis" would taste like whipped cream. But it had not; it had tasted sour instead.

## I. The indictment alleged aggravated sexual assault of a child, a first-degree felony, and Starkey waived any complaint to the contrary.

Starkey's first four issues focus on an allegedly defective indictment. He contends that although the grand jury indicted him for sexual assault of a child (a second-degree felony offense with a maximum punishment of 20 years' imprisonment and a fine not to exceed $10,000) and not aggravated sexual assault of a child (a first-degree felony offense with a maximum punishment of 99 years' or life imprisonment and a $10,000 fine), the petit jury convicted him of the first-degree offense, aggravated

4

sexual assault of a child. Tex. Penal Code Ann. §§ 12.33 ("Second Degree Felony Punishment"), 12.32 ("First Degree Felony Punishment"), 22.011(a)(2)(E), (f) ("Sexual Assault"), 22.021(a)(1)(B)(v), (a)(2)(B), (e) ("Aggravated Sexual Assault"). The same error meant that the jury punished him within the expanded range of the first-degree offense and beyond the range of the second-degree offense:

> [1] Did the trial court deprive [Starkey] of due process by submitting an unindicted offense of [a]ggravated [s]exual [a]ssault to the jury?
>
> [2] Was the indictment sufficient to support [Starkey's] conviction of first-degree felony aggravated sexual assault?
>
> [3] Was the indictment sufficient to support the jury charge for [first-degree] felony aggravated sexual assault?
>
> [4] Did [Starkey] receive an illegal sentence when he was charged in the indictment with [second-degree] felony sexual assault, but sentenced for first-degree felony aggravated sexual assault of a child?

Determining what the indictment alleged resolves all four issues.

As shown below, the "indictment" had two parts:

- a caption (above the charging instrument's horizontal divider), and

- the formal, statutory allegations as required by article 21.02 of the code of criminal procedure (below the horizontal divider). *See* Tex. Code Crim. Proc. Ann. art. 21.02.

The charging instrument provides:

No. 4743 Court: 271st Judicial District                    Bond $100,000

The State of Texas vs. RONALD STARKEY

Charge: SEXUAL ASSAULT CHILD

Second Degree Felony 22.011(a)(2) PC

5

Person ID 355992

_____

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Jack, State of Texas, duly selected, impaneled, sworn, charged, and organized as such at the January Term A.D. 2016 of the 271st Judicial District Court for said County, upon their oaths present in and to said Court at said term that RONALD STARKEY, hereinafter styled Defendant, on or about the 1st day of May, 2004, and before the presentment of this indictment, in the County and State aforesaid, did

> then and there knowingly cause the mouth of [Abby], a child who was then and there younger than 14 years of age and not the spouse of the defendant, to contact the sexual organ of the defendant.

Against the peace and dignity of the State.

/S/ [Foreperson]

Foreperson of the Grand Jury

The caption identifies the offense as a second-degree felony under § 22.011(a)(2)(E), which applies to a child "younger than 17 years of age." *See* Tex. Penal Code Ann. § 22.011(a)(2)(E), (c)(1), (f). But by including "a child who was then and there younger than 14 years of age," the formal, statutory allegations allege a first-degree felony. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(v), (a)(2)(B), (e).

To determine whether Starkey committed the second-degree felony, he contends that the allegation "a child who was then and there younger than 14 years of age" is surplusage and should thus be ignored. We are unpersuaded.

6

The charging instrument's formal, statutorily required portion—starting with "In the name and by authority of the State of Texas" and concluding with "Against the peace and dignity of the State," along with the foreperson's signature—shows that the grand jury indicted Starkey for the first-degree offense of aggravated sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 21.02. It follows that the caption misidentified the offense as a second-degree sexual assault of a child.

Starkey insists that we must consider the charging instrument as a whole, which includes the caption. *See Jenkins v. State*, No. PD-0086-18, 2018 WL 6332219, at *4–5 (Tex. Crim. App. Dec. 5, 2018). But to get there, Starkey must argue that the indictment is fundamentally defective (which was what the appellant in *Jenkins* argued[3]), and here Starkey argues that the indictment is fundamentally defective for lack of notice because it does not allege or identify aggravated sexual assault of a child in the caption. True enough, the caption does not—but the formal, statutorily required portion of the charging instrument unequivocally sets out the elements of aggravated sexual assault of a child. Thus, lack of notice is not the problem. That leaves us with an indictment that potentially alleges two identifiable offenses.

---

[3]*See Jenkins*, 2018 WL 6332219, at *1 ("Appellant argued to the trial court that, since the indictment filed by the State and read to the jury at the beginning of his trial did not name him personally, it did not charge 'a person,' and thus it was fatally defective . . . .").

Assuming, without deciding, that *Jenkins* applies as Starkey asserts,[4] the dispute becomes which of the two identifiable offenses within the indictment controls. Starkey asserts that the caption controls over the portion that the grand jury foreperson formally approved.

Initially, we note that Starkey's position on appeal is at odds with his position at trial, where he did not dispute that the indictment alleged aggravated sexual assault of a child, the first-degree felony. For example, as the trial court was making its opening remarks during voir dire, the following occurred:

> [THE COURT:] Mr. Starkey is . . . charged with sexual assault of a child. It says on the indictment that that's a second-degree felony, and—
>
> [PROSECUTOR]: Your Honor (gesturing), may we approach?
>
> THE COURT: Yes.

---

[4]*See Jenkins*, 2018 WL 6332219, at \*5 (stating that the rule set out in *Stansbury v. State* that the caption is not part of the indictment proper does not control when determining whether a charging instrument meets the constitutional definition of an indictment (citing 82 S.W.2d 962, 964 (Tex. Crim. App. 1935)); *see also State v. Beatty*, No. 09-17-00170-CR, 2018 WL 1097721, at \*2, \*3 (Tex. App.—Beaumont Feb. 28, 2018, no pet.) (mem. op., not designated for publication) ("In the present case, Beatty argues that because the indictment cites one particular statutory subsection but the body of the indictment tracks the language of another subsection within the same statute, he cannot be adequately apprised of which law applies to his case . . . . We find this argument unpersuasive.") ("[T]he [incorrect statutory] citation [about] which Beatty complains . . . is actually found in the caption. Texas courts have long held that a caption constitutes no part of an indictment. . . . Any error contained in the caption will be considered harmless surplusage absent a showing of prejudice." (citing *Stansbury*, 82 S.W.2d at 964; *Thibadeaux v. State*, 628 S.W.2d 485, 487 (Tex. App.—Texarkana 1982, no pet.))). Because we hold that Starkey waived his complaint, we need not decide whether *Jenkins* modified *Stansbury* in this context.

(At the Bench)

[PROSECUTOR]: It's wrong. It should be first-degree felony. It's aggravated. It was . . . submitted from the Sheriff's Department and didn't get changed on the—I apologize.

THE COURT: All right. It's okay.

[(To the venire)] Actually, I incorrectly stated on the indictment. It's a first-degree felony, and the . . . attorneys will discuss that with you more in just a few minutes.

Starkey did not object to the prosecutor's asserting that the indictment alleged a first-degree felony.

As another example, during the charge conference Starkey did not object to the charge, which encompassed aggravated sexual assault of a child and the lesser-included offenses of indecency with a child by sexual contact and indecency with a child by exposure. Tex. Penal Code Ann. § 21.11(a)(1), (2). Conspicuously absent was an instruction for the lesser-included offense of sexual assault of a child, presumably because if an offense occurred at all, it occurred to a child under 14 years of age. *See* Tex. Penal Code Ann. §§ 22.011(c)(1), 22.021(a)(2)(B), (b)(1); *see also State v. Meru*, 414 S.W.3d 159, 161 (Tex. Crim. App. 2013) (noting that whether to give an instruction on a lesser-included offense involves a two-step analysis: (1) are the elements of the lesser-included offense included within the proof necessary to establish the charged offense's elements? (2) is there evidence in the record from which a jury could find the defendant guilty of only the lesser-included offense?).

When the defendant does not attack an indictment "before the date on which the trial on the merits commences," the code of criminal procedure provides that the defendant "waives and forfeits" any complaint. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b).[5] Starkey finds himself precisely in that procedural position, so we apply article 1.14(b) here. If the indictment confused Starkey about which offense it charged, he had to complain "before the date on which the trial on the merits commence[d]." *Id.*; *see Jenkins*, 2018 WL 6332219, at *1 ("Since Appellant did not object to the indictment until the second day of his trial, he waived and forfeited the right to raise the objection on appeal." (citing Tex. Code Crim. Proc. Ann. art. 1.14(b)); *Kirkpatrick v. State*, 279 S.W.3d 324, 329 (Tex. Crim. App. 2009) ("Appellant had adequate notice that she was charged with a felony. If she had confusion about whether the State did, or intended to, charge her with a felony, she could have, and should have, objected to the defective indictment before the date of trial."); *Teal v. State*, 230 S.W.3d 172, 182 (Tex. Crim. App. 2007) ("If appellant was confused about whether the State did

---

[5]Article 1.14(b) provides:

> If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding. Nothing in this article prohibits a trial court from requiring that an objection to an indictment or information be made at an earlier time in compliance with Article 28.01 of this code.

Tex. Code Crim. Proc. Ann. art. 1.14(b).

10

or intended to charge him with a felony, he could have and should have objected to the defective indictment before the date of trial."). Because Starkey did not object before the trial started, he waived and forfeited his right to complain about any ambiguity regarding which of two offenses the indictment alleged. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b).

We overrule Starkey's first four issues.

## II. The trial court's instructions to the jury, which the jury presumptively followed, precluded it from using the special agent's and the investigator's comments during their interviews with Starkey against him.

Starkey's fifth issue focuses on the two recorded interviews conducted by Agent Troy Morris and Investigator Robert Pawley: "[5] Did the trial court err by admitting inadmissible hearsay and other impermissible statements made by investigators in the recorded interview of [Starkey]?" During the interviews, Agent Morris and Investigator Pawley talked far more than Starkey did, so Starkey argues that their comments constituted hearsay, bolstering, confrontation-clause violations, and infringements on the province of the jury.

### A. Background

Agent Morris interviewed Starkey on June 22, 2016. Before the State played the recorded interview to the jury, the trial court instructed the jury that Agent Morris's statements were not evidence:

> THE COURT: All right. Ladies and gentlemen, you are about to listen to an interview. And any statements by Troy Morris as to things

11

someone else may have said, you are instructed that you should consider those only for the limited purpose of what they actually are, a question and not as actual evidence themselves. You . . . can consider the statements made by the Defendant in this case in response to them for all purposes.

So you may proceed.

Investigator Pawley spoke to Starkey after Agent Morris did. Before the State played Investigator Pawley's recording to the jury, the trial court similarly instructed the jury not to consider Investigator Pawley's statements as evidence:

THE COURT: All right. Ladies and gentlemen, . . . in the event there are questions that bring in alleged statements made by someone else, the question in and . . . of itself by, in this case, Investigator Pawley would not be evidence in the case; however, any response made by the Defendant in the context within which it is made, based upon the question to the Defendant, can be considered as evidence for all purposes to the extent the jury wishes to consider it as evidence.

Please proceed.

The trial court followed up these admonishments with this jury-charge instruction: "You are instructed that the statements made by Special Agent Morris and D.A. Investigator Pawley during the recorded interviews with the Defendant are not admitted for their truth but only to assist you, if they do, in understanding the answers of the Defendant."

## B. Standard of Review

We review a trial court's ruling to admit or exclude evidence under an abuse-of-discretion standard. *Kirk v. State*, 199 S.W.3d 467, 478 (Tex. App.—Fort Worth 2006,

12

pet. ref'd). A trial court abuses its discretion if its decision falls outside the "zone of reasonable disagreement." *Id.*

**C. Discussion**

Here, before the jurors heard either interview, the trial court instructed them that what Agent Morris and Investigator Pawley said was not evidence. And in the charge, the trial court again instructed the jury to consider their statements only if helpful understanding Starkey's answers. Without evidence to the contrary, we presume that the jury follows the trial court's instructions. *Jenkins v. State*, 493 S.W.3d 583, 616 (Tex. Crim. App. 2016); *see Kirk*, 199 S.W.3d at 479. Starkey points to no such evidence. *See Jenkins*, 493 S.W.3d at 616.

And although Agent Morris and Investigator Pawley did most of the talking, the videos showed the jury how Starkey nonverbally responded to the accusations and the questions and, perhaps more importantly, how he did not deny them. This dynamic came out during Agent Morris's testimony:

BY [THE PROSECUTOR]:

Q. Now, Special Agent Morris, I think there was a question that was asked, and your response was you were looking for the truth, and then you added but. . . but he has another option. Can you . . . finish—I think the [d]efense attorney objected. So if you could finish your . . . thought on that particular matter.

A. So whenever we . . . bring out those affirmative questions I spoke about earlier regarding the moral behavior, we ask, obviously, about the . . . actual act itself. We also introduce . . . an option to save face, such as in this one about the masturbation, but they can also deny that

13

happened. That's their third option. They can . . . deny. I hope I've answered your question.

Q. Yes, sir. So that certainly was, you know, an option for the Defendant to say, I don't know what you're talking about, I've never done this, she's lying?

A. Yes, that's correct.

Q. And that never occurred, correct?

A. No, it never did.

Moreover, Starkey had an opportunity to cross-examine Agent Morris and Investigator Pawley at trial about their interviewing techniques.

Because the trial court instructed the jury not to consider Agent Morris's and Investigator Pawley's statements as evidence, and because nothing rebuts the presumption that the jury followed the trial court's instructions, we conclude that there was no hearsay, no bolstering, no confrontation-clause violation, and no invading the jury's province. *See Kirk*, 199 S.W.3d at 478–79.

We overruled Starkey's fifth issue.

### III. The trial court erroneously allowed two witnesses to testify about Abby's 2004 outcry to the babysitter, but the error was harmless.

Starkey's sixth and seventh issues challenge the outcry witnesses' testimony:

[6] Did the trial court impermissibly admit hearsay testimony from two outcry witnesses when Texas law only permits hearsay testimony from the first adult to whom a child describes an alleged offense?

[7] Did the trial court impermissibly admit hearsay outcry testimony when the testimony offered did not describe the alleged offense?

## A. Standard of Review

Code of criminal procedure article 38.072 ("Hearsay Statement of Certain Abuse Victims") governs when a trial court may properly admit the outcry witness's hearsay testimony in sex-related offenses committed against children younger than 14 years old. *See* Tex. Code Crim. Proc. Ann. art. 38.072. This article provides that the trial court may admit hearsay statements if the State complies with the statutory notice requirements and if—in a hearing outside the jury's presence—the trial court finds that

(1) the statement is reliable based on its time, content, and circumstances;

(2) the complainant testifies or is available to testify at the proceeding; and

(3) the statement:

- describes the alleged offense,

- was made by the complainant against whom the charged offense or other extraneous crime, wrong, or act was allegedly committed, and

- was made to the first person, 18 years of age or older, other than the defendant, to whom the complainant made a statement about the offense or extraneous crime, wrong, or act.

*Id.* art. 38.072, §§ 2(a)(1)(A), 2(a)(2), 2(a)(3), 2(b)(2), 2(b)(3); *Espinoza v. State*, 571 S.W.3d 427, 431 (Tex. App.—Fort Worth 2019, pet. ref'd).

We review for an abuse of discretion a trial court's ruling designating an outcry witness. *Espinoza*, 571 S.W.3d at 430. The trial court has broad discretion when determining whether to admit such evidence, and we will uphold a trial court's

15

findings when the evidence supports them. *Id.* at 430–31. A trial court does not abuse its discretion unless its decision falls outside the zone of reasonable disagreement. *Chapman v. State*, 150 S.W.3d 809, 813 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Tear v. State*, 74 S.W.3d 555, 558 (Tex. App.—Dallas 2002, pet. ref'd)).

The outcry witness is the first person, 18 years or older, to whom the child makes a statement that in some discernible manner describes the alleged offense. *Espinoza*, 571 S.W.3d at 431 (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)); *see West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Article 38.072 allows the first person to whom the child described the offense in some discernible manner to testify about the statements the child made."). And the "discernible manner" must be more than words alluding generally that "something in the area of child abuse was going on." *Espinoza*, 571 S.W.3d at 431 (quoting *Garcia*, 792 S.W.2d at 91).

An outcry witness is not person-specific but is event-specific. *West*, 121 S.W.3d at 104. A trial court may admit hearsay testimony from more than one outcry witness under article 38.072 only if the witnesses testify about different events; for any one event, there may be only one outcry witness. *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011); *Hernandez v. State*, No. 02-14-00262-CR, 2016 WL 4903206, at *12 (Tex. App.—Fort Worth Sept. 15, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *West*, 121 S.W.3d at 104). The trial court has broad discretion to

16

determine which of several witnesses is an outcry witness to a particular event, and unless it clearly abuses its discretion, we will not disturb its decision. *Chapman*, 150 S.W.3d at 813 (citing *Garcia*, 792 S.W.2d at 92; *Hayden v. State*, 928 S.W.2d 229, 231 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)).

## B. Background

### 1. State's Motion.

In the State's motion to admit a child-abuse victim's hearsay statement, the State sought to admit Abby's 2015 outcry to Mother and "[i]n the alternative or in addition to" that outcry, Abby's "oral statements" to the babysitter over a decade earlier. But in the motion, the State conceded that Abby's outcry to the babysitter did not describe the alleged offense in a discernible way:

> COMES NOW THE STATE OF TEXAS and, pursuant to Article 38.072 of the Texas Code of Criminal Procedure, requests this Court to rule that the oral statements made by [Abby] on or about March or April 2015, to [Mother], [Abby's] mother, admissible at the trial of this case. Statements made by [Abby] to [Mother] provide a description as to time, content, and circumstances of the alleged offense that is the subject of the Indictment. The written summary of said oral statement is attached hereto and marked as State's Outcry of [Abby] (Exhibit 1). In the alternative or in addition to testimony provided by [Mother] and pursuant to Article 38.072 of the Texas Code of Criminal Procedure, the State of Texas requests this Court to rule that oral statements made by [Abby] on or about 2004 or 2005, to [the babysitter] shall be admissible at the trial of this case. [Abby's] statement to [the babysitter] is general in nature as to time, content, and circumstances and does not describe the alleged offense or she does not recall the specific details of [Abby's] statement that is the subject of the Indictment in a discernable way. A copy of the oral statement made to [the babysitter] is attached hereto and marked as State's Outcry of [Abby] (Exhibit 2).

. . . .

WHEREFORE, PREMISES CONSIDERED, the State prays that this Court set this motion for hearing, if necessary, and rule that at the trial of this case the State may offer proof of the statements made by [Abby] to [Mother] on or about March or April 2015 through the testimony of [Mother]. In the alternative or in addition to the testimony of [Mother], the State prays that this Court rule that at the trial of this case the State may offer proof of the statements made by [Abby] to [the babysitter] on or about 2004 or 2005 through the testimony of [the babysitter].

## 2. The Article 38.072 Hearing

At the hearing on the State's motion, the babysitter testified just as the State alleged she would—that is, the babysitter described Abby's outcry as not including the alleged offense in any discernible way. Despite that, the trial court ruled that it would allow the babysitter's testimony.

### a. The Babysitter

Initially, the babysitter asserted that the outcry was that Abby was being touched by Starkey in a way that made Abby uncomfortable:

[THE BABYSITTER:] Well, we were sitting in the living—in the living room watching TV, like little kids do. She was really into Dora at the time. And she just—out of the blue she says, you know, people touch me. I said, okay. I said, I touch you. She said, yeah, but it's different. I said, okay. She said, some people touch me and make me uncomfortable. I said, well, who? And she said, I can't tell you. It would make things rough. I said, okay. So I didn't say anything else.

And a little while later, not too long later, she said she needed— she wanted to tell me who it was. And I said, okay. And she said it was her daddy. And at the time, the only father she had I knew of was [Starkey]. So I didn't say anything else about it. I didn't push her to tell me how or anything else. And I waited for [Mother] to come home.

18

Later, when asked if she told Mother that Abby had said anything about oral sex, the babysitter responded that she did not recall:

A. No. What I told [Mother] was that [Abby] said she was uncomfortable. And when she finally told me who it . . . was that touched her, she said it was her daddy.

Q. And you didn't say to [Mother] that [Abby] made any descriptive— gave any description like her having to lick whipped cream off of his genitals?

A. Not that I recall.

Q. You didn't make that statement?

A. Not that I recall.

### b. Mother

In contrast, Mother remembered the babysitter's describing Abby's outcry differently: "[The babysitter] had mentioned touching and licking whipped cream from his genitalia." Despite Mother's asserting that Abby's outcry—as the babysitter allegedly described it to Mother—included oral sex, Mother denied ever speaking to Abby about it.

Mother explained that not until 2015 did Abby make an outcry directly to her, but she added that Abby's 2015 outcry included oral sex, just as Mother remembered the babysitter's describing Abby's 2004 outcry:

A. It was March or April of 2015. She was in a hospital in northern San Diego. I had been doing what they call Kik messaging with her friend. Her friend told me that I needed to speak with [Abby] and that I should know something. And I was asking her what, and she used the word

19

"ruined." And I asked her what does ["]ruined["] mean, and she said you need to speak with [Abby].

So I went to visitation with [Abby] that evening. And as visitation was ending, I sent my smaller children out of the area so I could speak with [Abby] by myself. And I said, [Abby], you know your friend asked me about this and told me I needed to speak with you, and this is what "ruined" meant to me. And [Abby] started crying and said that she was worried I was gonna think she was crazy and that I wouldn't believe her and brought up a time when she was younger. She said she thought she was 3 or 4, that she was forced to lick whipped cream off of Mr. Starkey's genitalia.

Q. Was that consistent with the story that you had learned from [the babysitter] 12 years earlier?

A. Yes, sir.

### c. Trial-Court Arguments

At the end of the article 38.072 hearing, Starkey argued against letting the babysitter testify at all, which, in the context of the State's motion, would have left Mother as the outcry witness for Abby's 2015 outcry:

[DEFENSE COUNSEL]: Well, your Honor, under 38.072, Section 2(a), the . . . article applies only to statements that (1)(A) describe the alleged offense, or, of course, there's a—our next section wouldn't be applicable at this point, the statements offered during the punishment phase of the proceeding, a crime, wrong, or act of an alleged offense, and that is—it goes on for other details.

But [the babysitter]—despite [Mother's] claim of what was said to her, [the babysitter] has a statement before the Court she wrote out, . . . State's Exhibit 55, that she affirmed on direct and cross-examination, that what she said was she was being touched—referring to [Abby], said she was being touched and it made her uncomfortable.

[The babysitter], the hearsay . . . outcry witnesses, for purposes of this statute, leaves it at that. That's . . . the full scope of her statement. It

20

doesn't describe the offense . . . in the indictment[;] it does not describe the manner and means of the indicted offense, which is to cause the mouth of [Abby] to contact the sexual organ of the Defendant. So because it doesn't describe the alleged offense and that word, I would submit to the Court, the statutory construction would require the Court to pay attention to the words actually placed in the . . . Code, the alleged offense, it must describe the alleged offense. It describes something that . . . may or may not be criminal[—]to touch a child. It doesn't describe that . . . causing the mouth of the child to contact the sexual organ of the Defendant.

And for those reasons I would object under 38.072. And that would be . . . the first adult or the first person over 18 that [Abby] spoke to about . . . an incident that would be outside the bounds of normal parenting between herself, [Abby], and Mr. Starkey.

THE COURT: Okay. Are you saying that . . . none of her testimony should be allowed or—

[DEFENSE COUNSEL]: Yes. . . . I'm saying that [the babysitter's] testimony should not be allowed because it doesn't describe the offense as . . . the Code requires under 38.072.

In contrast, deviating from its motion, the State then pitched making the babysitter the outcry witness based on Abby's 2004 outcry to her:

THE COURT: Counsel?

[THE PROSECUTOR]: Judge, . . . in this particular matter we have a very, very, very young child. I mean, she was 4 at the time of the disclosure. Clearly, in her best ability—and, of course, the jury can put what weight that . . . they want, but it is the first person . . . over 18 years of age that had any information of something occurring of a sexual nature. So we think she's the appropriate person to disclose the events that occurred. And, you know, unfortunately, . . . she was a very young child and we're just . . . stuck with the fact that she was . . . 4 at the time of the . . . disclosure, so we would ask that . . . her particular statements to [the babysitter] be admissible.

THE COURT: All right. I'm going to—as far as the testimony given here today, I'm going to overrule the objection, and she . . . will be permitted to testify to what . . . she's testified to here today.

[THE PROSECUTOR]: And with clarification, . . . [the babysitter] will be able to testify?

THE COURT: Yes.

As the later trial testimony shows, this ruling effectively made the babysitter the outcry witness under article 38.072.

### 3. At Trial

During trial, the trial court allowed testimony about Abby's 2004 outcry to the babysitter but not about Abby's 2015 outcry to Mother. Mother was, however, allowed to testify about what the babysitter had purportedly told Mother about Abby's outcry to the babysitter.

#### a. Investigator Pawley

Without disclosing the contents of the 2004 outcry, Investigator Pawley testified that Abby had made an outcry to the babysitter in "2003, 2004."

#### b. The Babysitter

When the babysitter took the stand, Starkey renewed his objection from the article 38.072 hearing, which the trial court overruled, and then requested and received a running objection to the babysitter's testifying. The babysitter proceeded to describe Abby's outcry to the jury in the same manner that she had described it to the judge at the hearing:

22

A. One day we were watching TV, and [Abby] said that people touched her. I said, okay. I touch you. She said, yeah, but it's different. I said, okay. And she said that sometimes the way people touched her made her uncomfortable, and I asked her who. She said, well, I can't tell you because it would make things (inaudible)—

THE REPORTER: I can't tell you what?

THE WITNESS: I can't tell you because it would makes things rough.

A. So I let it go. And a little while later she just kind of stopped, and she looked at me and she said, I'm going to tell you who it is. And I said, okay. I said, who? She said, my daddy. I didn't push it any further. I waited for [Mother] to come home, and I told her.

Q. Now, did you have a conversation with [Mother] when she returned home?

A. Yes, I did.

Q. And what did you tell her?

A. I told her that [Abby] had told me that her daddy had been touching her. And as far as I knew, [Starkey] was . . . the only person she knew as her dad.

And as with the pretrial hearing, the subject turned to the babysitter's conversation with Mother about Abby's outcry, and the babysitter again denied recalling any oral-sex outcry:

Q. And what you told [Mother] was that [Abby] had said she was being touched and it was by her daddy?

A. Yes.

Q. So you didn't say anything to [Mother], and you told us just a couple of days ago that [Starkey] had made [Abby] get whipped cream off his genitals with her mouth?

23

A. No, sir, that was not my testimony. What I told you was that that was an item I could not recall.

Q. And . . . it's not in your statement?

A. No, it is not.

Q. So in 2016, if that was in your knowledge, you would have reported that, right?

A. If I had recalled it, yes.

Q. Okay. What do you mean by if you had recalled it?

A. As I said, it's not something I recall, and it is not a vision that I would want stuck in my head.

. . . .

Q. (BY DEFENSE COUNSEL) Nowhere in Defendant's Exhibit No. 1 do you state anything about Mr. Starkey making [Abby] lick whipped cream off of his genitals?

A. No, sir, none of it.

Q. You said that would stick out in your mind, right?

A. If that were to have been said and they left [Texas], I'm afraid that that would be a memory that I would not want to remember, because at that point there was nothing I could do about it.

### c. Mother

Mother was the State's next witness, and the prosecutor broached the subject of what the babysitter had told her. Mother asserted—over Starkey's objection—that the babysitter had said that Abby's outcry included licking whipped cream off Starkey's genitals:

Q. What did she [the babysitter] tell you?

24

A. She told me that—

[DEFENSE COUNSEL]: I don't mean to interrupt, your Honor. Just renew my same objection, 38.072.

THE COURT: I understand your objection. Overruled.

[DEFENSE COUNSEL]: For this witness may I have a running objection on [38.072]?

THE COURT: You may.

[DEFENSE COUNSEL]: Thank you, your Honor.

Q. (BY [THE PROSECUTOR]) What is your recollection of what [the babysitter] told you?

A. She had told me that during her time of watching [Abby] that day that [Abby] had mentioned that Mr. Starkey had touched her inappropriately and had her lick whipped cream off his genitalia.

But when the State attempted to get in Abby's 2015 outcry to Mother, the trial court kept it out:

Q. Based on that, . . . did you seek treatment for her?

A. Yes, sir.

Q. And ultimately did she go to Chandler, New Mexico?

A. Chandler, Arizona—

Q. Excuse me. I'm sorry.

A. —yes, sir.

Q. Chandler, Arizona.

Now, prior to that time,[6] did you have a conversation with your daughter [Abby] . . . about an incident that had occurred between the Defendant and her?

A. Yes, sir.

Q. All right. And what did she tell you?

A. She told me --

[DEFENSE COUNSEL]: Excuse me. Object to hearsay, your Honor, and violation of confrontation clause.

THE COURT: At this time I'm going to sustain the objection.

Q. (BY [THE PROSECUTOR]) Let me ask it this way: I'm not asking for the specific details, based on the Court's ruling. I'm just asking in general, did she give you some information that caused you much concern?

A. I was scared because it was information that I had been told years before.

Q. The same information?

A. Yes, sir.

### d. Abby

Less than a month shy of her eighteenth birthday when testifying, Abby articulated the offense as: "I performed oral sex on him," and she then provided details. Abby did not recall having whipped cream that night, but she asserted that

---

[6]Abby's outcry to Mother occurred in San Diego. Abby "ultimately" went to Chandler, Arizona, for treatment, and it was there that her forensic interview occurred.

Starkey had told her that "the white stuff . . . from his penis" would taste like whipped cream. She stated that it instead tasted sour.

Regarding what she had told the babysitter, Abby said, "I told [the babysitter] that he told me that it tastes like whipped cream." On cross-examination, Abby repeated that all she had told the babysitter was that Starkey had said that "it" tasted like whipped cream:

> Q. . . .
>
> The . . . first time—well, of course, you testified that you remember [the babysitter]—did you call [the babysitter by her first name]?
>
> A. Yes, sir.
>
> Q. Do you remember that conversation? Do you actually remember it?
>
> A. Briefly.
>
> Q. Can you explain that, please?
>
> A. I remember I told her that he said it would taste like whipped cream.
>
> Q. Is that all you said to her?
>
> A. Yes, sir.

### C. Discussion

#### 1. Error

The babysitter's testimony was that, to her recollection, Abby had complained only about Starkey's touching her in some way that made her feel uncomfortable, but that testimony did not describe the alleged offense or even necessarily an offense at

27

all; at best it was "a general allusion that something in the area of child abuse was going on," which appears to have been the babysitter's understanding, because she spoke to Mother about it. *See Espinoza*, 571 S.W.3d at 431. But this outcry did not describe the alleged offense in a discernible way, so article 38.072 did not authorize the babysitter's hearsay testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(1)(A); *Espinoza*, 571 S.W.3d at 431.

And Mother's testimony—that the babysitter had asserted that Abby had made an outcry to the babysitter that Abby had performed oral sex on Starkey—would have made the babysitter the outcry witness. *See Espinoza*, 571 S.W.3d at 431. Mother was not the outcry witness in 2004 because Abby never made an outcry to her at that time. *See id.* Conversely, if the trial court disbelieved Mother's testimony regarding the scope of Abby's 2004 outcry (that is, if the trial court disbelieved Mother's assertion that Abby made an oral-sex outcry to the babysitter in 2004), then Abby's oral-sex outcry to Mother in 2015 would have made Mother the first adult over 18 to whom Abby made such an outcry. Either way, article 38.072 did not authorize Mother's hearsay testimony regarding the 2004 outcry. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(3).

Ultimately, Mother's testimony regarding the 2004 outcry was hearsay within hearsay. *See McDowell v. State*, No. 02-17-00410-CR, 2018 WL 6215906, at *4 n.6 (Tex. App.—Fort Worth Nov. 29, 2018, no pet.) (mem. op., not designated for publication). Mother was relying on what the babysitter had told her; the babysitter

28

was relying on what Abby had told the babysitter. And as noted, neither the babysitter nor Mother independently qualified as the 2004 outcry witness under article 38.072. *See* Tex. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

We hold that the trial court erred by permitting both the babysitter and Mother to testify about Abby's 2004 outcry.

### 2. Harm

Improperly admitting hearsay testimony is nonconstitutional error that is harmless unless the error affected the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); *Nino v. State*, 223 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2007, no pet.). An error is harmless if we are reasonably assured that the error did not influence the verdict or had only a slight effect. *See Garcia*, 126 S.W.3d at 927; *Shaw v. State*, 329 S.W.3d 645, 653 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Likewise, improperly admitting evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *Merrit v. State*, 529 S.W.3d 549, 556 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

Here, allowing the babysitter and Mother to testify about the 2004 outcry was harmless error. Our reasoning follows.

29

During Starkey's interviews, he admitted that something had happened with Abby in 2004 but that it was accidental. Abby herself described something quite different. The indictment alleged that Starkey "knowingly cause[d] the mouth of [Abby], a child who was then and there younger than 14 years of age and not the spouse of [Starkey], to contact [Starkey's] sexual organ." The question for the jury was not so much whether Abby's mouth in fact contacted Starkey's penis, which Starkey seemed to grudgingly concede, as it was whether Starkey's penis *accidentally* contacted her mouth.

The 2004 outcry testimony varied both about whether oral sex was alleged and, assuming it was alleged, about how whipped cream fit into the outcry.

The babysitter's testimony harmonized more with Starkey's story (accidental contact) than Abby's (oral sex)—that is, something happened that upset Abby, but whatever it was, the babysitter did not recall Abby's describing it in 2004 as oral sex.

In contrast, Mother asserted that the babysitter had said that Abby's outcry had included oral sex. Mother's and Abby's respective testimony about the 2004 outcry also did not align about whipped cream's role in the assault.

But for all its inconsistencies—usually a fertile area for creating reasonable doubt—what the 2004 outcry testimony tended to do was corroborate what Starkey himself conceded during his interviews: that something of a sexual nature had happened between him and Abby in 2004.

Here, the jury heard both Starkey's version—through his interviews—and Abby's version through her testimony, and so the jury did not have to rely on the babysitter's or Mother's memories of what they had heard (or not heard) over a decade earlier. And unlike the outcry witnesses, neither Starkey nor Abby had difficulty remembering that something out of the ordinary occurred; they simply differed on whether it had occurred accidentally or knowingly.

Starkey's explanations about being startled might have served to "save face" during the interviews, as Agent Morris discussed, but for purposes of creating a reasonable doubt at trial, jurors might have seen them as far-fetched. The jury, as the factfinder, determines witnesses' credibility, and for each witness, it can choose to believe all, some, or none of that witness's testimony. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim App. 1991); *Chasco v. State*, 568 S.W.3d 254, 258 (Tex. App.—Amarillo 2019, pet. ref'd). With or without the outcry testimony, the jury could have concluded that Starkey's explanations were implausible.

We are thus reasonably assured that the evidentiary error did not influence the verdict or had only a slight effect. *See Garcia*, 126 S.W.3d at 927; *Hernandez*, 2016 WL 4903206, at *13; *Shaw*, 329 S.W.3d at 653.

We overrule Starkey's sixth and seventh issues.

## IV. Starkey's cumulative-error argument fails.

In his final issue, Starkey argues: "[8] Did the trial court err by allowing hearsay testimony, improper witness testimony, and impermissible 'bolstering' statements that

were so pervasive as to cumulatively affect the fundamental fairness of the trial?" Having held that the trial court erred only in Starkey's sixth and seventh issues but also having held that those errors were harmless, and not having held that the trial court otherwise erred in Starkey's other issues, Starkey has no other error or harm to cumulate. *See Jenkins*, 493 S.W.3d at 613.

We overrule Starkey's eighth issue.

## Conclusion

Having held that there was no error in Starkey's first, second, third, fourth, fifth, and eighth issues and having held that there was harmless error in Starkey's sixth and seventh issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 15, 2019