**AFFIRMED and Opinion Filed August 19, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00126-CR

**SILVINO RICARDO AREVALO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1624895**

## MEMORANDUM OPINION

Before Justices Bridges, Brown, and Nowell
Opinion by Justice Bridges

A jury convicted appellant Silvino Ricardo Arevalo of capital murder (murder in the course of committing or attempting to commit robbery), and the trial court sentenced him to life imprisonment without the possibility of parole. Appellant raises nine issues on appeal. In his first two issues, he challenges the sufficiency of the evidence to support his conviction. He challenges the admission of extraneous offenses in issues three, four, and five. In his sixth issue, he challenges the admission of jail phone calls that the State allegedly intercepted in violation of his constitutional rights. In his seventh issue, he asserts he suffered egregious harm when the trial court failed to sua sponte instruct the jury on lack of voluntary act. He alleges in his eighth issue that his constitutional rights were violated when the trial court sentenced him to mandatory life

imprisonment without the possibility of parole. Finally, he contends he received ineffective assistance of counsel. We affirm.

## Background

On the evening of November 10, 2016, Tanisha Macias hung out at the home of David Martinez and his girlfriend Adrianna Ortega. Appellant, a friend of Martinez, was also hanging out. Macias, who was an exotic dancer at the time, was not working that night and mentioned she was looking to make some extra money. Martinez suggested Lupitas, a bar in Garland known as a location where men paid women for drinking and spending time with them. The foursome left for Lupitas in Ortega's black Chrysler 300. When they arrived, Macias and Ortega went in first. The men followed about ten minutes later.

Around 9 p.m., Daniel and Ishmael Mendez arrived at Lupitas, ordered drinks, and rented a pool table. As they finished their last game, Macias approached them and started flirting. Ishmael continued talking with her and at some point, he slapped her bottom. They were not aggressive towards her, and surveillance video did not show her reacting angrily towards the men after the incident. However, because she was drinking and "ha[d] a memory of something happening" to her, she "got angry after a while." After a little more conversation, she demanded money from Ishmael for the time she spent with them. She could not remember exactly what she said, but something like, "[I]f you're going to touch my bottom, at least give me money or something." Ishmael had no interest in her continued advances, and the men decided to leave. Macias became "very aggressive" and followed them out.

Roberto Negrete was the security guard for Lupitas and described the night as starting out "calmly." However, when Daniel and Ishmael were leaving, Negrete observed Macias following them. Negrete told Ishmael, "I'm watching y'all, and I see that they're the ones getting aggressive."

Macias threw her beer on Ishmael. Despite her behavior, Ishmael remained calm, ignored her, and left. Negrete ordered Macias to leave; however, she ignored him. He grabbed her arm, and Macias hit him in the eye as he forced her to leave. Ortega also hit him. Negrete then used pepper spray in his continued efforts to get the women off the property. Macias testified that although she felt violated by Ishmael's actions, she did not get angry until Negrete got involved.

Negrete heard Daniel or Ishmael yell something like, "That's what you get for hitting people," as they drove away in Daniel's white car. It was not said in anger but in a "teasing" manner. Macias allegedly heard one of the brothers yell, "You're dead, B." No one else heard the threat, and she kept it to herself.

Macias wanted to get the white car's license plate number so she could file a police report. She also threatened to sue the bar. She admitted she was not really going to sue the bar, but was irritated and "just saying that stuff." She did not remember telling Martinez and appellant to drive after the white car. Rather, she remembered screaming and crying from the pepper spray.

The foursome got in Ortega's black car to leave. Appellant was in the front passenger seat and Macias sat behind him. Martinez drove while Ortega sat behind him. Surveillance video showed the two cars left Lupitas within a few minutes of each other. Macias could not tell where they were driving.

As Daniel and Ishmael approached the intersection of Ferguson and Gus Thomasson, Daniel heard a car "going fast and stopped really fast, real hard." The black car stopped to the left of their car, and Daniel heard gunshots. Bullets missed his head by inches. Daniel identified appellant as the man who pulled the trigger.

Macias recalled hearing two gunshots. She ducked and grabbed Ortega because she thought they were being shot.

Daniel drove away quickly, but Martinez continued in pursuit. Daniel estimated they were driving over seventy or eighty miles per hour. Daniel eventually wrecked his car into another car that turned in front of him. The passenger of that vehicle described the impact as "very hard and violent."

Daniel testified to the following events surrounding the shooting. Martinez approached and pulled Daniel out of the car. Appellant pulled Ishmael from the passenger side. Martinez demanded Daniel's gold chains, which he surrendered. Martinez also took a gold ring from him. Martinez then pistol-whipped Daniel in the head. About the same time, Daniel heard a gunshot. When Daniel checked on Ishmael, he saw a gunshot wound to his head and Ishmael died within seconds in Daniel's hands. Although Daniel did not see appellant shoot Ishmael, Daniel saw appellant running away from where Ishmael died. The men returned to the car and drove away. When Daniel talked to detectives later that night, he told them the shooter "had to be somebody that followed us from Lupitas."

Macias testified she felt their car stop and heard both front doors open. Neither man said anything about what they planned to do. She then heard one gunshot. Macias never saw anything, but recalled the men returning and driving her home. She repeatedly asked them what happened, but they never answered her.

Katelyn Sorrels lived in an apartment near the accident scene. About 1 a.m., she was leaving her complex and heard the car crash. She called 911. She saw two men jump out of a black car. One ran to the passenger's side and the other ran to the driver's side. She "heard [] the bang and seen the flash in my rear view," but did not see any interaction between the men.

Isabel Rivera was asleep in her apartment when the loud crash from the car wreck woke her up. When she looked out her window, she saw two men approaching the white car, one on the passenger side and one on the driver's side. She described the man that walked to the driver's side

–4–

as "fat" and the other one as "skinny." As she walked from her window to the front door to get a better look, she heard the gunshot. She did not see who fired the gun or either man with a gun in their hand as they returned to the black car. The "fat" man got in the driver's side, and the "skinny" one got in the passenger's side of the car.

Kathryne Juarez, who lived nearby, asked a "skinny guy" if he needed any help, but he did not answer her. Instead, he walked back to the car and left. She did not see this man with a gun and did not pay attention to which side of the car he went to.

Detective Brian Worsham served as lead investigator. He described the scene upon arrival as very chaotic. He observed the wrecked cars, a deceased individual, a distraught relative, and numerous witnesses. Once he assessed the scene, he assisted in transporting witnesses to the police station for interviews. Once he learned the incident began at Lupitas, he went to the bar and obtained surveillance video. He also reviewed reports from the previous night and learned of Negrete's assault. Detective Worsham followed up on that incident and recovered a cell phone. From the cell phone, he started identifying potential suspects.

The day after the murder, Macias said appellant asked Martinez if she "needed to be green lit," meaning have a hit out on her because of her knowledge of the events. She said she was not going to talk to anyone or ask questions.

Detectives interviewed Macias, Ortega, and Martinez, but they denied seeing appellant with a gun or firing a gun. Eventually, all four were transferred to Lew Sterrett jail. While they were waiting, Martinez told Macias appellant planned to confess to everything.

Based on the initial investigation, appellant and Martinez were charged with murder. Detective Worsham acknowledged "the girls are kind of what started this whole incident," but they were not involved in anything that happened after they left Lupitas. The murder charge was upgraded to a capital crime after Daniel told investigators they stole his neck chains. Detective

Worsham also heard a 911 call in which one of the men said, "Give me that bread." On the street, "bread" referred to money.

Dr. Reade Quinton, the deputy chief medical examiner, performed Ishmael's autopsy. He determined the gunshot wound to Ishmael's forehead was "atypical." Because the wound did not have any gunshot residue or soot within it, he surmised the gun was not fired at close range, meaning it was not a contact gunshot wound. He could not estimate the distance from which the gun was fired because detectives never recovered the murder weapon. However, he believed it was likely fired from more than a few feet from Ishmael's head. Dr. Quinton classified the manner of death as homicide.

The jury convicted appellant of capital murder. The trial court sentenced him to mandatory life imprisonment without the possibility of parole. This appeal followed.

**Sufficiency of the Evidence**

In his first two issues, appellant argues the evidence is legally insufficient to support his conviction because the State failed to establish his principal or party liability as the shooter or his specific intent to commit capital murder. The State responds the evidence is sufficient to prove appellant's identity as the shooter and his intent to commit capital murder.

When reviewing the sufficiency of the evidence, an appellate court considers all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). Appellate courts are required to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. An appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* All evidence, whether

–6–

properly or improperly admitted, will be considered when reviewing the sufficiency of the evidence. *Id*.

If the record supports conflicting inferences, we must presume the factfinder resolved the conflicts in favor of the State and defer to that determination. *Id*. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Texas Penal Code section 19.03(a)(2) states that a person commits capital murder if he commits murder, as defined under section 19.02(b)(1) (intentionally or knowingly causing the death of an individual), and he intentionally commits the murder in the course of committing or attempting to commit a robbery (intentionally, knowingly, or recklessly causing bodily injury to another in the course of committing theft with intent to obtain or maintain control of property). TEX. PENAL CODE ANN. §§ 19.03(a)(2), 29.02. Intent to commit murder may be inferred by circumstantial evidence, including a defendant's acts, words, and the extent of a victim's injuries. *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014). Evidence is sufficient to prove an underlying robbery for purposes of a capital murder conviction if it shows the defendant formed an intent to obtain or maintain control of property before or contemporaneously with the murder. *Shuffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006). If there is evidence from which a rational jury could conclude beyond a reasonable doubt "that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the [prosecution] has proven that the murder occurred in the course of robbery." *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995).

Appellant has not challenged the sufficiency of the evidence of the underlying robbery, but instead challenges his identity as the shooter and his intent to commit murder. We consider each argument in turn.

Appellant first argues the evidence is insufficient to establish his identity as the shooter because no one testified to seeing him shoot a gun, witness testimony was inconsistent with the forensic evidence, and Macias's hearsay testimony was inherently unreliable.

The State may prove a defendant's identity by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). The absence of an in-court identification does not in and of itself render the evidence insufficient on the issue of identity. *Espinoza v. State*, 571 S.W.3d 427, 434 (Tex. App.—Fort Worth 2019, pet. ref'd).

Macias testified that when the foursome left Lupitas, appellant was sitting in the front passenger seat. They drove quickly and she recalled hearing two gunshots. Her testimony aligns with Daniel's testimony that a black car chased them and two shots were fired towards him from the passenger side of the black car. He identified appellant as the person who shot at him.

When the black car stopped, Macias heard the front doors open and both men get out. Witnesses that heard the car wreck testified two men exited the car. The "fat one" went to the driver's side of Daniel's car and the "skinny one" went to the passenger side. One witness identified the "fat one" as the driver of the black car.

Daniel testified Martinez had a gun, but he only used it to pistol-whip him. The jury could infer that the one gunshot several witnesses heard after the men exited the car came from appellant's gun. Daniel saw appellant running away from where Ishmael died. One witness testified the "skinny one" ran to the passenger side of the black car after the shooting.

Ramirez later told Macias that appellant accidentally shot the gun. During a subsequent jailhouse call, Martinez said appellant needed to "step up" and take responsibility for what he did. In another jailhouse call, appellant said the gun went off accidentally.

The day after the murder, appellant threatened to "green light" Macias if she talked about the shooting. Evidence of threats may establish a "consciousness of guilt"; therefore, the jury could reasonably infer he threatened her because he was the shooter. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.); *see also Rocha v. State*, No. 05-15-01401-CR, 2017 WL 85420, at *2 (Tex. App.—Dallas Jan. 10, 2017, no pet.) (mem. op., not designated for publication).

Appellant emphasized Daniel was never shown a line up to confirm which man pistol-whipped him. However, Daniel told detectives the passenger in the car began shooting at them at the intersection of Ferguson and Gus Thomasson. A video from moments before they approached the intersection showed defendant in the front passenger seat. The jury was free to weigh any conflicting evidence and disbelieve that appellant and Martinez switched positions in the car, meaning Martinez was the passenger who shortly thereafter exited the passenger side of the car and killed Ishmael.

Based on Daniel's account and other witness statements, Martinez was the man who pistol-whipped Daniel. Thus, the jury could reasonably infer appellant shot Ishmael. It was within the province of the jury, as the fact finder, to weigh and evaluate the credibility of the evidence, and we will not substitute our judgment for that of the jury. *Jackson*, 443 U.S. 319. Accordingly, the evidence is legally sufficient to support the conclusion that appellant murdered Ishmael. Appellant's first issue is overruled.

We now consider whether the evidence is sufficient to establish appellant intended to kill Ishmael. Appellant claims the forensic evidence along with testimony that the shooting was accidental negates specific intent.

By its nature, a culpable mental state must generally be inferred from the circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). The culpable mental state for murder can be inferred from a defendant's motive or the extent of the victim's injuries. *Id*. A jury may also consider the acts, words, and conduct of the accused, and the method of committing the crime. *Hebert v. State*, No. 05-02-00208-CR, 2003 WL 1870558, at *2 (Tex. App.—Dallas Apr. 14, 2003, no pet.) (mem. op., not designated for publication). The circumstances accompanying the use of a deadly weapon may support a finding that a defendant had the specific intent to cause the death of another. *Cordova v. State*, 698 S.W.2d 107, 112 (Tex. Crim. App. 1985). If a deadly weapon is used in a deadly manner, the inference is almost conclusive the defendant intended to kill. *Id*. (citing *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986)).

Here, it is undisputed Ishmael died from a single gunshot wound to the head. Appellant's use of a deadly weapon in a deadly manner is a strong inference of his intent to kill Ishmael. *Id*. Further, during the recorded 911 call, the brothers were told "You're dead B" and ordered to "Give me that money. Hurry up, I'll beat yo ass. Hurry up ho. Give me that bread." Within seconds, there was a gunshot. Then a voice said, "yea wassup." The jury could infer from these words appellant intended to kill in the course of committing or attempting to commit robbery.

To the extent the jury heard evidence that the shooting was accidental, the jury was free to disbelieve such testimony. The jury could have believed the suggestion that the shooting was accidental was self-serving. Moreover, the medical examiner testified Ishmael was not shot at close range thereby negating the likelihood that the gun fired accidentally during a struggle between the two men.

To the extent the jury saw a picture of a bullet hole in the back of Daniel's car and another on the side of the car that was consistent with being fired from behind, such forensic evidence does not discredit Daniel's testimony that he saw appellant shooting at them from the passenger side. Rather, we assume the jury resolved such conflict in evidence in favor of the State. *Jackson*, 443 U.S. at 319.

Viewing the evidence in the light most favorable to the verdict, a rational fact finder could have found beyond a reasonable doubt that appellant, in the course of robbing or attempting to commit robbery, intended to kill Ishmael. We overrule appellant's second issue.

**Extraneous Offenses**

In issues three, four, and five, appellant argues the trial court erroneously admitted extraneous offenses that were irrelevant and unduly prejudicial in violation of his rights to due process. *See* TEX. RS EVID. 403, 404. The extraneous offenses related to appellant's gang affiliation, his drug use, and his threat to "green light" Macias. The State responds appellant failed to preserve his issues for review.

To preserve an issue for appellate review, a party must timely object, stating the specific legal basis for the objection. TEX. R. APP. P. 33.1(a). The failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). Appellant concedes he failed to object to Detective Vann's testimony regarding his affiliation with the gang unit, which the jury could have inferred meant appellant was a gang member. Appellant also concedes he failed to object to Macias's testimony regarding appellant's drug use. Thus, he failed to preserve his issues for review. *See, e.g., Smith v. State*, 595 S.W.2d 120, 123 (Tex. Crim. App. 1980) ("failure to object waives any error in admission of evidence tending to show an extraneous offense"). Appellant's third and fourth issues are overruled.

Appellant objected to Macias's testimony that she felt "intimidated because [Martinez] had told me that he had said something about green lighting me if I said anything" as hearsay. On appeal, he challenges the statement under rules 403 and 404. A defendant's objection on appeal must comport with the specific objection made at trial. *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). A complaint is not preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). Because appellant's argument on appeal does not comport with his trial objection, he failed to preserve error, if any, for review. TEX. R. APP. P. 33.1; *Grubbs v. State*, No. 05-15-01429-CR, 2016 WL 5851921, at *1–2 (Tex. App.—Dallas Oct. 6, 2016, no pet.) (mem. op., not designated for publication). We overrule appellant's fifth issue.

**Admission of Jail Phone Calls**

In his sixth issue, appellant contends his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution (and corresponding Texas constitutional provisions) were violated when the trial court admitted illegally intercepted jail phone calls. In one call, appellant claimed the gun fired accidentally. In another call, Martinez told someone appellant needed to take responsibility for his actions. The State responds appellant failed to preserve his issue for review, and the substance of his complaint was solicited by defense counsel's attempt to attack the State's allegation that he intentionally shot Ismael.

An appellant cannot make an appellate error of an action he induced. *See Vennus v. State*, 282 S.W.3d 70, 74 (Tex. Crim. App. 2009). Here, the State did not introduce the phone calls or discuss the phone calls during its case-in-chief. The phone calls were brought to the jury's attention through defense counsel's cross-examination of Detective Worsham.

More importantly, neither appellant nor the State objected to the testimony regarding the jail phone calls. To preserve an issue for appellate review, a party must timely object, stating the

specific legal basis for the objection. TEX. R. APP. P. 33.1(a). Because appellant failed to object to the testimony, he failed to preserve error, if any, for review. We overrule appellant's sixth issue.

## Jury Charge Error

In his seventh issue, appellant argues he suffered egregious harm when the trial court failed to sua sponte submit an instruction on lack of voluntary act. The State responds, assuming the trial court erred, the record does not establish egregious harm.

We review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005).

Appellant presented evidence the shooting at the site of the wrecked vehicle was involuntary. Based on the evidence, appellant contends the court should have included a "voluntary act" instruction. *See* TEX. PENAL CODE ANN. § 6.01(a) ("A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession."). Even assuming the trial court's omission was error, because appellant argues jury charge error for the first time on appeal, we can reverse his conviction only if the error caused him egregious harm. *Estrada v. State*, 334 S.W.3d 57, 63 (Tex. App.—Dallas 2009, no pet.). Errors result in egregious harm when they affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Id.* To make this determination, we examine the entire jury charge, the state of the evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.*

As discussed in detail above in the sufficiency review of the evidence, the jury could have reasonably concluded appellant did not accidentally shoot Ishmael. Daniel's testimony belies such a conclusion. More importantly and perhaps even more persuasive, is the content of the 911 call in which the brothers were told they were dead shortly before the shooting occurred. There was

no evidence in the record of a struggle prior to the shooting; therefore, there was no accidental discharge of the weapon.

Defense counsel cross-examined witnesses and challenged the State's theory that appellant intentionally killed Ishmael. Thus, he was not denied presentation of a viable defensive theory. Moreover, the jury instructions provided that if the jury had a reasonable doubt that he was guilty of capital murder or aggravated robbery, it should find appellant guilty of the lesser-included offense or acquit. Accordingly, considering the state of the evidence, the jury charge, and the record as a whole, appellant did not suffer egregious harm from the alleged charged error. We overrule appellant's seventh issue.

**Constitutionality of Mandatory Life Imprisonment Without Parole**

In his eighth issue, appellant argues his mandatory life sentence without parole is an unconstitutional sentence for capital murder and violates his rights under the Eighth and Fourteenth Amendments of the Constitution as well as article I, sections 10, 13, and 19 of the Texas Constitution. He asserts his sentence imposes cruel and unusual punishment without the opportunity to present mitigating evidence, "an archaic concept" that "does not comport with evolving standards of decency." The State responds the constitutionality of penal code section 12.31(a)(2) is settled, and appellant provides no reason to reconsider it. *See* TEX. PENAL CODE ANN. § 12.31(a)(2) ("an individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole, if the individual committed the offense when 18 years of age or older").

The Supreme Court has concluded an automatic life sentence without parole does not violate the Eighth Amendment. *See Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991). Multiple courts, including this one, have continued to follow *Harmelin*, holding that the Eighth

Amendment does not guarantee adult defendants an individualized punishment hearing when sentenced to life in prison without the possibility of parole for capital murder. *See Kim*, 2015 WL 1935948, at \*6; *see also Simms v. State*, No. 06-18-00181-CR, 2019 WL 2479845, at \*10 (Tex. App.—Texarkana June 14, 2019, pet. filed) (mem. op., not designated for publication); *Cormier v. State*, 540 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Lewis v. State*, 448 S.W.3d 138, 147 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Buhl v. State*, 960 S.W.2d 927, 935–36 (Tex. App.—Waco 1998, pet. ref'd). Appellant has not presented any new arguments to distinguish these cases other than arguing *Harmelin* is outdated and does not comport with "evolving standards of decency." We overrule appellant's eighth issue.

### Ineffective Assistance of Counsel

In his ninth issue, appellant argues his appointed counsel was not qualified for appointment pursuant to article 26.052 of the code of criminal procedure, and therefore, should have refused appointment to his case. Because counsel was not statutorily qualified to take the case, appellant contends the face of the record demonstrates ineffective assistance of counsel. Appellant further argues defense counsel performed deficiently because he failed to file any pretrial motions, including a motion for discovery under the Michael Morton Act. The State responds article 26.052 does not apply to his case, and the record fails to demonstrate any deficient conduct to support an ineffective assistance claim.

The standard of review for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the *Strickland* two-step analysis, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 687–88, 694; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An appellant bears the burden of proving his claims

by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Appellate review of counsel's representation is highly deferential, and we must "indulge in a strong presumption that counsel's conduct was not deficient." *Nava*, 415 S.W.3d at 307–08. To overcome this presumption, claims of ineffective assistance of counsel must be firmly founded in the record and affirmatively demonstrate the alleged ineffectiveness. *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). However, a reviewing court will rarely be in a position to fairly evaluate the merits of an ineffective assistance of counsel claim on direct appeal because the trial record is usually undeveloped and inadequate to reflect the motives behind trial counsel's actions. *Id*. Rather, trial counsel should have the opportunity to explain his actions before being condemned as ineffective. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Therefore, when the record is silent as to trial counsel's strategy, we assume counsel had a sound strategy, unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see also Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

Appellant first argues defense counsel was deficient for failing to decline appointment to his case because at the time of defense counsel's appointment, he was not on the list of those attorneys qualified to accept appointments. The State contends article 26.052 does not apply to appellant's case. We agree.

Article 26.052 states, "this article establishes procedures in death penalty cases for appointment and payment of counsel to represent indigent defendants at trial and on direct appeal and to apply for writ of certiorari in the United States Supreme Court." TEX. CODE CRIM. PROC.

ANN. art. 26.052(a). Although the State concedes the written record does not contain a waiver of the death penalty, the trial record establishes that the State was not seeking the death penalty. The trial court informed the potential jurors during voir dire, "This is not a death penalty case. So I want to make sure you're aware of that up front." The State later reemphasized "death is not being considered in this case" while discussing punishment with the potential jurors. And finally, the State indicated the death penalty was not at issue during its closing argument.

The plain language of article 26.052 applies only to death penalty cases. The State was not seeking the death penalty. Nothing in the record indicates defense counsel believed the State was seeking the death penalty when he accepted the appointment. Nothing in the record indicates appellant was misled by the State and believed the death penalty was a possible punishment. Thus, the record does not support appellant's claim that counsel's performance fell below an objective standard of reasonableness because he was unqualified to accept the appointment. *See Salinas*, 163 S.W.3d at 740 (claims of ineffective assistance of counsel must be firmly founded in the record and affirmatively demonstrate the alleged ineffectiveness). Because appellant cannot satisfy the first *Strickland prong*, his ineffective assistance of counsel claim based on article 26.052 fails.

Appellant's contention that counsel was ineffective because he failed to file pretrial motions likewise fails. In general, counsel's failure to file pretrial motions does not result in ineffective assistance of counsel. *See Martinez v. State*, 449 S.W.3d 193, 208 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Rather, appellant must show a pretrial motion had merit and a ruling on the motion would have changed the outcome of the case. *See Roberson v. State*, 852 S.W.2d 508, 511 (Tex. Crim. App. 1993); *see also Straight v. State*, 515 S.W.3d 553, 565 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

Appellant has not identified any specific pretrial motion counsel should have filed other than "an absence of a written motion for discovery under the Michael Morton Act." First, article

39.14 does not require an attorney to file a discovery request, but instead states "as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection" of certain documents. TEX. CODE CRIM. PROC. ANN. art. 39.14. Further, appellant has not indicated what he could or should have received had counsel filed such a motion, how such evidence would have changed the outcome of the case, or that he was prejudiced in any way. Accordingly, appellant fails to show how counsel was deficient or articulate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. 668, 687; *see also Hoffman v. State*, No. 09-17-00172-CR, 2018 WL 5930308, at *8 (Tex. App.—Beaumont Nov. 14, 2018, pet. ref'd) (mem. op., not designated for publication) (ineffective assistance of counsel claim failed because appellant made no showing trial counsel's failure to obtain discovery would have changed outcome of trial or that it prejudiced her in any way). Appellant's ninth issue is overruled.

## Conclusion

The judgment of the trial court is affirmed.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
180126F.U05

–18–



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

SILVINO RICARDO AREVALO,
Appellant

No. 05-18-00126-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1624895.
Opinion delivered by Justice Bridges.
Justices Brown and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered August 19, 2019