

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-25-00066-CR
_____

### DILLON AUSTIN VENSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2024F00037

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

A Cass County jury convicted Dillon Austin Venson of indecency with a child by contact and assessed a sentence of twenty years' imprisonment with a $10,000.00 fine.[1] *See* TEX. PENAL CODE ANN. § 21.11. On appeal, Venson argues that (1) the evidence is insufficient to support the jury's verdict of guilt, (2) the trial court should have designated the victim's mother as the outcry witness instead of the forensic interviewer, and (3) the State improperly commented on Venson's post-arrest silence.

We find that legally sufficient evidence supports the jury's verdict of guilt and that the trial court did not abuse its discretion by designating the forensic interviewer as the outcry witness. We also find that the trial court did not abuse its discretion by overruling Venson's Fifth Amendment complaint related to his invocation of the right to remain silent during the investigation. As a result, we affirm the trial court's judgment.

## I. Factual Background

Rose Lane[2] was a twelve-year-old girl who lived with her mother, Carol Ginny. Ginny's adult daughter, Bailey, would occasionally bring Venson to Ginny's residence, sometimes spending the night. The State's indictment alleged that Venson engaged in sexual contact with Rose by touching her genitals.[3]

---

[1]In our pending appellate cause number 06-25-00065-CR, Venson appeals another conviction for indecency with a child.

[2]We use pseudonyms for all family members to protect the identity of "any person who was a minor at the time the offense was committed." TEX. R. APP. P. 9.10(a)(3).

[3]In Venson's pending appeal in cause number 06-25-00065-CR, the State alleged that Venson caused Rose to touch his genitals with the intent to arouse or gratify his sexual desire.

Rose testified to three instances of inappropriate touching by Venson. Rose said the first incident occurred when she was asleep on the couch and awoke to Venson's hand under her blanket. Rose said that Venson rubbed her legs and moved his hand toward her "private area." According to Rose, Venson then rubbed his fingers back and forth on top of her shorts on her "private area" and then on top of her underwear. Rose said that no one else was in the room when that occurred and that she felt scared and "froze." Rose testified that a second incident occurred while she, Bailey, and Venson were on the couch watching a horror movie. According to Rose, after Bailey fell asleep, Venson began rubbing Rose's legs and placed his finger "in [her] private area." Rose testified that a third incident occurred on Bailey's birthday after Bailey fell asleep while watching a different movie with Rose and Venson. According to Rose, Venson made Rose touch his penis with her hand after Bailey had fallen asleep.

The State introduced a chat message from Rose to Venson in which Rose advised Venson to focus more on Bailey since Bailey was an adult and Rose was "just a [twelve]-year-old little girl, not so important." Ginny testified that she discovered the chat message while checking Rose's cell phone and believed it suggested an inappropriate relationship between Rose and Venson.

Ginny testified that she went to Rose's room to talk about the chat messages with her and that Rose gave her a look that Ginny would "never forget," as if "[Rose] was scared and relieved at the same time." According to Ginny, during that conversation, Rose disclosed that Venson had "messed with" her on three occasions on the couch with "his hand[s] down her pants." Ginny emphasized that her conversation with Rose was brief and only lasted about five minutes.

3

Ginny said Rose did not give details about the incidents but that the conversation led Ginny to call the police.

Ginny then sent a message to Venson asking if he wanted to divulge any information about himself and Rose, which prompted Venson to reply that he "like[d] Rose but [he] wouldn't do anything to, like, get in trouble or anything." Ginny said that she took Venson's responses to mean "[t]hat he knows."

Amy Vallery, a deputy with the Cass County Sheriff's Office, testified that on the day of the outcry, she requested that a forensic interview be scheduled at the children's advocacy center for the following Monday. Maureen Fletcher, a forensic interviewer with the Texarkana Children's Advocacy Center, testified that Rose made an outcry of sexual abuse. According to Fletcher, Rose described three separate instances of sexual abuse.

In the first incident, which occurred three or four months before August 2023, Rose told Fletcher that she was "on the couch with a blanket on top of her, and when she woke up, [Venson] was sitting on the side of the couch and he was touching on her thigh." Rose said that Venson's hand then went "up to. . . her girl's private spot . . . under her shorts, on top of her underwear." According to Fletcher, Rose "said that [Venson's] finger was rubbing on her girl's private spot." As for the second incident, Fletcher testified that Rose said Venson "put[] his hand on her thigh again" after Bailey fell asleep while the three of them were watching a scary movie. According to Fletcher, Rose said that she got up and moved away as Venson "started moving his hand up" her thigh. Fletcher testified that Rose said the third incident occurred on June 2, 2023, when she woke up with Venson's "finger . . . inside her private spot" and that, after

4

noticing she was awake, Venson "put her hand on his private spot . . . making an up and down motion" while "his hand was on top of her hand."

Venson testified in his own defense and denied sexually touching Rose. Venson acknowledged a close relationship with Rose but characterized it as appropriate and denied any intent to arouse or gratify his sexual desire.

To rebut Venson's testimony, Rose testified that during the second touching, she could not remember "if [Venson] actually did go inside, but [she did] remember he went on top of [her] underwear." Rose then reiterated that Venson "had put his finger inside of [her]" during the third touching and that "[h]e made [her] touch him."

After hearing that evidence, the jury found Venson guilty of indecency with a child by contact.

## II. Sufficient Evidence Supports the Jury's Verdict

Venson's first point of error argues that the evidence was legally insufficient because "Rose's lack of credibility, as demonstrated by discrepancies between her statements to a forensic interviewer and her trial testimony, rendered the evidence at trial so weak that no rational trier of fact could have found guilt beyond a reasonable doubt." We disagree.

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson v. State*, 589 S.W.3d 292, 298 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In this case, the State's indictment alleged that Venson, on or about April 1, 2023, "with

5

the intent to arouse or gratify [his] sexual desire," "engage[d] in sexual contact with Rose Lane (pseudonym) . . . by touching the genitals of [Rose], a child younger than 17 years of age."

As a reviewing court, we look to all the evidence in the light most favorable to the State to determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *Saxon v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). In performing our evidentiary sufficiency review, therefore, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the jury. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We must presume that the jury resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (recognizing "the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). Moreover, we afford almost complete deference to a jury's decision when it is "based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008).

The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* at 707. Even when there are inconsistencies[4] during trial, it is the duty of the jury to decide the issue of credibility. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *see Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no

[4]During trial, Fletcher acknowledged that Rose's initial trial testimony added genital penetration to the second time, which differed from what Rose had told her. Rose testified on rebuttal that she could not remember if penetration occurred during the second time and testified that Venson penetrated her and "[h]e made [her] touch him" during the third time.

6

pet.). "[R]econciliation of conflicts in the evidence is [also] within" that duty. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *see Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994) (per curiam).

Here, the jury was free to believe Rose's testimony that Venson touched her genitals and that the touching occurred to arouse or gratify Venson's sexual desires. Rose's testimony about the separate instances of touching alone was legally sufficient to lead a rational jury to find the essential elements of the offense. *See Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.— Texarkana 2006, pet. ref'd) ("The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault or indecency with a child."); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.07. Simply put, Rose's testimony, the chat messages Ginny discovered, and Fletcher's testimony of Rose's outcry provided more than sufficient evidence from which a rational jury could find, beyond a reasonable doubt, that Venson committed indecency with a child by contact as alleged by the indictment.

Because the evidence was legally sufficient to support the jury's verdict of guilt, we overrule Venson's first point of error.

## III. There Was No Abuse of Discretion in Designating the Forensic Interviewer as the Outcry Witness

In his second point of error, Venson argues that the trial court abused its discretion by designating Fletcher rather than Ginny as the proper outcry witness.

7

### A. Standard of Review and Applicable Law

Article 38.072 of the Texas Code of Criminal Procedure establishes an exception to the hearsay rule, applicable in prosecutions of sexual offenses, for statements describing the offense made by a child victim "to the first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3) (Supp.). To be admissible under Article 38.072, outcry testimony must be elicited from the first adult to whom the outcry is made. *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). To be a proper outcry statement, the child's statement to the witness must describe the alleged offense, or an element of the offense, in some discernible manner and must be more than a general allusion to sexual abuse. *Id.*

"We review a trial court's ruling on an outcry witness designation for an abuse of discretion." *Espinoza v. State*, 571 S.W.3d 427, 430 (Tex. App.—Fort Worth 2019, pet. ref'd) (citing *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990)). "A trial court's findings will be upheld when they are supported by the evidence, and the trial court has broad discretion in determining such evidence's admissibility." *Id.* at 430–31 (citing *Garcia*, 792 S.W.2d at 92) ("requiring a clear abuse of discretion to be established by the record before the trial court's outcry witness ruling will be disturbed").

### B. The Outcry Hearing

The trial court conducted a hearing outside of the jury's presence to choose the proper outcry witness. During the outcry hearing, Ginny testified that she questioned Rose about the chat messages and that Rose told her she "woke up with [Venson's] hands down her pants" but

8

"wouldn't tell [Ginny] much more." Ginny was not certain how many times Rose said something inappropriate happened but believed there were three incidents. Ginny testified that one incident happened "on the couch," and that Bailey was "literally sleeping next to them when" Venson placed "his hands in [Rose's] pants," but that Rose did not describe how Venson had touched her.

Ginny said that the "conversation didn't last very long at all, because [Rose] would not hardly tell [her] anything," although Ginny had heard enough to call the police. On cross-examination, Ginny said, "[Rose] ha[d] not told [her] anything, except she told [her] three different occasions that [Venson] messed with her. When [Rose] talked about her hand -- his hand down her pants is when she woke up on the couch. So she hasn't really gave me details on [the] three incidents."

During the same hearing, Fletcher testified that, in the forensic interview, Rose described three separate incidents and provided specific details for each account. As for the first touching, Fletcher testified that Rose said she woke up from sleeping on the couch to Venson "leaning over her touching on her thigh." Rose told Fletcher that Venson "moved his hand and was under [her] shorts [but] on top of [her] panties rubbing on her girls'[sic] private spot." Rose told Fletcher that she thought it happened around "May-ish," and that she was wearing "shorts and a black T-shirt."

When referring to the second incident, Rose told Fletcher that she was on the couch with Bailey and Venson as they were watching a scary movie. According to Fletcher, Rose said Bailey fell asleep and Venson again "put his hand on her thigh and tried to touch her that time,"

9

but that his efforts were thwarted when Rose got up and walked away. Rose recalled that she was wearing "short[s] and [a] sun shirt."

Fletcher also said that Rose detailed the third incident. Rose told Fletcher that during Bailey's birthday party in June, after watching a movie on the couch, Rose woke up on the couch to Venson's fingers inside her private part. Rose also told Fletcher that Venson "held her hand on his private part, and made his private part go up and down and do an up and down hand motion." Rose described that she "felt some warm stuff come out on her hand. And she said it was a warm liquid and it was white. [Rose] then said that she wiped her hand on the blanket." Rose "washed her hands, and then went into her room and cried."

## C.    Analysis

Article 38.072 "furthers the societal interest in curbing child abuse by preventing the designation of a person who only received a vague suggestion of abuse over a later-in-time person who received a more detailed account of sexual abuse." *Buentello v. State*, 512 S.W.3d 508, 517 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *Garcia*, 792 S.W.2d at 91). Here, we find that the trial court did not abuse its discretion in designating Fletcher as the outcry witness since Ginny's recollection of Rose's initial disclosure was vague and general in comparison to Fletcher's detailed testimony about all three incidents.

Ginny specifically acknowledged during the outcry hearing that Rose did not give her details other than "she woke up with his hands in her pants." Such a description only alluded to abuse because it did not describe that the offense indicted—touching of Rose's genitals— occurred. *See Bargas v. State*, 252 S.W.3d 876, 894 (Tex. App.—Houston [14th Dist.] 2008,

10

pet. ref'd) ("Such general allusions, in which the complainant does not describe the abuse in a discernible manner, are not within the purview of article 38.072."). In comparison, Fletcher testified in a manner clarifying that Rose's statements to her provided the first discernible details sufficient to comprise the criminal conduct charged. *See Lopez*, 343 S.W.3d at 140; *Anyanwu v. State*, No. 06-25-00018-CR, 2025 WL 1947791, at *3 (Tex. App.—Texarkana July 16, 2025, no pet.) (mem. op., not designated for publication).

We conclude that the trial court did not abuse its discretion by designating Fletcher to be the outcry witness. As a result, we overrule Venson's second point of error.

## IV. The Trial Court Did Not Err by Overruling Venson's Objection About His Right to Remain Silent During the Investigation

In his last point of error, Venson argues that the trial court erred by allowing the State to question him about his post-arrest silence during cross-examination. The record shows that, after his arrest in Arkansas, Venson was brought to Cass County, where Venson declined to speak with an investigator. At some point, Venson was given *Miranda* warnings.[5] As a result, Venson objected during trial after the State asked Venson if the investigator was trying to get a statement from him. During a bench conference, the trial court overruled Venson's "Fifth Amendment" complaint, finding that Venson "waived the Fifth Amendment right by taking the stand." More specifically, Venson stated that the "jury [did] not need to hear that" Venson invoked his right not to speak to the investigator "without a lawyer." Because the trial court overruled Venson's objection, the State elicited Venson's testimony that he declined to speak to the investigator.

---

[5] The record is unclear as to whether Venson invoked his right to remain silent before or after being issued *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

On appeal, Venson argues that the trial court erred by failing to sustain his objection regarding his post-arrest silence. Venson's appellate brief discusses both the United States Constitution and the Texas Constitution.

First, we find that Venson's complaint based on the Texas Constitution is unpreserved. To preserve a complaint for appellate review, a party must make a timely, specific objection stating the grounds for the desired ruling with sufficient clarity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1)(A); *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). The record must reflect that the trial court understood the basis of the objection. *See Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Here, the record shows that Venson only used the Fifth Amendment in support of his objection and that the trial court overruled his Fifth Amendment complaint. *See* U.S. CONST. AMEND. V. "[I]t is well settled that the legal basis of a complaint raised on appeal cannot vary from that raised at trial." *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). For this reason, the Texas Court of Criminal Appeals has determined that an objection that only mentions the Fifth Amendment does not preserve a Texas Constitutional claim. *Id.* at 537, 543. Likewise, we find Venson's claim under the Texas Constitution is unpreserved.

As for Venson's Fifth Amendment complaint, "[w]e review [a] trial court's decision to admit or exclude evidence" for "an abuse of discretion." *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *see Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.

Crim. App. 1991) (op. on reh'g). We will uphold an evidentiary ruling if it was correct under any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Further, we may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

A comment on a defendant's post-arrest, post-*Miranda* silence, even during a defendant's impeachment or cross-examination, violates the rights of the accused under the Fifth Amendment of the United States Constitution. *Doyle v. Ohio,* 426 U.S. 610, 618 (1976); *Johnson v. State*, 83 S.W.3d 229, 231 (Tex. App.—Waco 2002, pet. ref'd); *Myers v. State*, No. 06-12-00156-CR, 2013 WL 1867623, at *4 (Tex. App.—Texarkana May 3, 2013, pet. ref'd) (mem. op., not designated for publication) (citing *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995)). This is because "[t]he plain language of the Fifth Amendment protects a defendant from *compelled* self-incrimination." *Salinas v. State*, 369 S.W.3d 176, 179 (Tex. Crim. App. 2012), *aff'd*, 570 U.S. 178 (2013). However, "[i]n pre-arrest, pre-*Miranda* circumstances, a suspect's interaction with police officers is not compelled." *Id.* For this reason, "the Fifth Amendment is not violated by the use of *prearrest* silence to impeach a criminal defendant's credibility" after he has chosen to testify. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) (emphasis added). As explained by the United States Supreme Court in *Jenkins*,

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

13

*Id.* at 237–38 (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971) (citations omitted)).  For

this reason, "[a]ttempted impeachment on cross-examination of a defendant . . . may enhance the

reliability of the criminal process" if the issue involves prearrest silence.  *Id.* at 238.

Further, the United States Supreme Court extended *Jenkins* by determining in *Fletcher v.*

*Weir* that the Fifth Amendment is not violated when the State cross-examines or impeaches a

testifying defendant about post-arrest silence if *Miranda* warnings were not yet given.  *Fletcher*

*v. Weir*, 455 U.S. 603, 607 (1982) (per curiam); *see Sanchez v. State*, 707 S.W.2d 575, 577 (Tex.

Crim. App. 1986); *see Salinas*, 369 S.W.3d at 178 ("The State does *not* violate a defendant's

Fifth Amendment rights, however, by cross-examining a defendant as to post-arrest, pre-

*Miranda* silence when a defendant chooses to testify.").

Here, before the trial court made its ruling, it had nothing before it showing when Venson

received *Miranda* warnings.  Because Venson's objection only encompassed the Fifth

Amendment, Venson had to show he was issued *Miranda* warnings before invoking his right to

remain silent to avoid the result in *Fletcher*.  Because there was no such evidence, the trial court

was free to apply *Fletcher* and to conclude that Venson's post-arrest, pre-*Miranda* silence did

not violate the Fifth Amendment.

Applying the abuse of discretion standard, we cannot say that a trial court erred if its

ruling was correct under any theory of law applicable to the case.  *De La Paz*, 279 S.W.3d at

344.  In the absence of any information showing when Venson received *Miranda* warnings, we

cannot say that the trial court abused its discretion by applying *Fletcher* in concluding that

14

Venson's Fifth Amendment rights were not violated.  As a result, we overrule Venson's last point of error.

## V.       Conclusion

We affirm the trial court's judgment.


                                        Charles van Cleef
                                        Justice


Date Submitted:        December 17, 2025
Date Decided:          May 11, 2026

Do Not Publish